U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 NOV -1 AM 9: 32

CLERK
BY ₱C
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

PROPERTY AND CASUALTY INSURANCE )
COMPANY OF HARTFORD, )
)
Plaintiff, )
)
v. ) Case No. 5:11-cv-118
)
JAMES DAVENPORT, )
)
Defendant. )

**OPINION AND ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**
(Doc. 28)

Plaintiff Property and Casualty Insurance Company of Hartford ("Hartford") brings this action against Defendant James Davenport seeking a declaratory judgment that it has no obligation under a homeowner's insurance policy (the "Policy") issued to Mr. Davenport for claims arising out of the loss that occurred on May 28, 2009. Presently before the court is Hartford's motion for summary judgment. (Doc. 28.) Mr. Davenport opposes the motion. The court heard oral argument on July 10, 2012.

Hartford is represented by Andrew C. Boxer, Esq. Mr. Davenport is represented by Michael S. Brow, Esq.

I.  **The Undisputed Facts.**

At all times relevant to this dispute, Mr. Davenport resided at 1021 VT Route 105, Sheldon, Vermont, 05483 (the "Insured Property"). Between July 24, 2008 and July 24, 2009, the Policy provided coverage for the Insured Property subject to, among other things, the following exclusion: "We do not insure for loss caused directly or indirectly by any of the following . . . **8. Intentional Loss** [-] Intentional Loss means any loss arising out of any act an 'insured' commits or conspires to commit with the intent to cause a loss." (Doc. 27 at ¶ 5.) On May 28, 2009, Mr. Davenport set fire to the Insured

Property. Following the fire, Mr. Davenport submitted a claim for coverage, which Hartford denied based on the intentional loss exclusion.

At the time of the fire, Mr. Davenport was sixty-eight years old and lived on a fixed income, totaling approximately $3,000 per month. On July 4, 2008, Sally Boudreau, Mr. Davenport's wife, passed away. Following his wife's death, Mr. Davenport purchased a new Ford pick-up truck, Corvette, RV camper, and motorcycle, financing each of these vehicles. He intended to sell the Insured Property, move into the RV camper, and travel. In furtherance of this plan, Mr. Davenport moved most of his belongings out of the Insured Property to make it more marketable for sale. The only belongings Mr. Davenport kept on the Insured Property were a recliner chair, a television, and a couch that his dogs slept on.

By May 2009, Mr. Davenport had fallen into a severe depression. His depression coincided with accusations by his stepdaughter that he had molested her when she was a child. He had also begun to appreciate the tremendous debt that he had incurred, which left him barely able to feed himself and his dogs. Throughout May 2009, Mr. Davenport contemplated ways to commit suicide, considering alternatives such as consuming medication and alcohol for "courage," shooting himself, and crashing his car. Three days before the fire, he ultimately decided upon setting fire to his house while he was inside.

On May 28, 2009, Mr. Davenport fed his dogs and let them out into a fenced yard so that they would not be harmed. He also drank some alcohol and ingested pills. Thereafter, Mr. Davenport sprayed lighter fluid on a number of cardboard boxes and lit them on fire, which led to the destruction of the Insured Property. Fire department personnel rescued Mr. Davenport from the fire, but he attempted to regain entry into the burning house.

Following his attempt to reenter, Trooper Jacob Metayer took Mr. Davenport into protective custody and placed him in handcuffs in the back of a police cruiser. After Mr. Davenport complained of shoulder pain, Trooper Metayer removed the handcuffs. Once removed, Mr. Davenport attempted to cut his wrist using his watch. In response to this second suicide attempt, he was taken to Northwestern Medical Center for emergency

treatment. The "Crisis Evaluation/Counseling Report" from Northwestern Medical Center ("Northwestern") indicates that Mr. Davenport's "Speech" was "Normal[;]" his "Behavior" and "Attention" were both "Unremarkable[;]" his "Thought Process" was "Goal Directed[;]" his "Perception" was "Not Impaired[;]" and he was "Fully oriented[.]" (Doc. 29-4 at 4.)

Mr. Davenport was subsequently transferred to the Vermont State Hospital ("VSH") where he was evaluated that same day. An "Integrated Admission Assessment and Physician Certification" indicated that his "Behavior Toward the Examiner" was "Calm and cooperative[;]" his "Attention" was "Alert[;]" his "Thought Process/Associations" were "Logical, associations tight[;]" and his "Insight" was "Good[.]" *Id.* at 11-12.

On June 2, 2009, Paul G. Cotton, M.D., a board-certified psychiatrist, performed a court-ordered examination to assess Mr. Davenport's competency to stand trial for first degree arson. Dr. Cotton determined that he was competent to stand trial. On June 26, 2009, Dr. Cotton performed a second court-ordered evaluation to determine whether Mr. Davenport had the mental capacity to form the requisite criminal intent necessary for first degree arson.[1] Dr. Cotton concluded that while Mr. Davenport did not lack the capability to appreciate the wrongfulness of his act, he "did not have the mental state required for the offense charged . . . and would be considered insane at the time of the alleged offense." *Id.* at 29.[2] Dr. Cotton explained that Mr. Davenport "acted with intent to kill

---

[1] Under Vermont law, "[a] person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he or she lacks adequate capacity either to appreciate the criminality of his or her own conduct or to conform his or her own conduct to the requirements of the law." 13 V.S.A. § 4801(a)(1).

[2] Dr. Cotton's conclusion that Mr. Davenport was criminally insane would not have been admissible evidence in a federal criminal trial. *See* Fed. R. Evid. 704(b) ("[A]n expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone."). However, in this civil case such an opinion "is not objectionable [solely] because it embraces an ultimate issue" to be decided by the trier of fact. *Id.* at 704(a). Furthermore, neither party disputes the admissibility of Dr. Cotton's evaluation in this case, so

3

himself without regard to a careful choice of method. His thinking was so compromised by his severe depression that he could not choose a lawful method to reach his goal." *Id.* at 28.

On July 9, 2009, the State of Vermont stipulated to the dismissal without prejudice of the first degree arson charge against Mr. Davenport, conditioned upon his compliance with an aftercare plan.

## II. Disputed Facts.

In opposing summary judgment, Mr. Davenport has submitted the following additional facts, which Hartford has not responded to, nor sought to strike. For the purposes of this motion for summary judgment, the court will consider these facts disputed, *see* Local Rule 56(b), although it notes that Hartford appears to contend that even if these facts are considered, summary judgment in its favor remains appropriate.

Mr. Davenport asserts that he had been taking Prozac for anxiety and depression since the 1990s and was prescribed Lithium in 1999, which he took periodically. He further asserts that he ceased taking both his Prozac and Lithium around the time of his wife's death in July 2008, and he began to feel depressed in late 2008, which worsened through the early part of 2009. He notes that he has been diagnosed as having bipolar disorder.

Mr. Davenport also claims that he was mentally incapable of controlling his actions and impulses at the time of the fire because "[h]e had lost his capacity for rational thought," and "the intensity of the despair that he showed by his actions was the mental equivalent of the irrationality that is expressed in a delusional belief[.]" (Doc. 32-11 at 14.) When setting the fire, Mr. Davenport asserts he did not intend to burn down the house and was not even thinking of the house. Instead, he contends that he started the fire with the specific purpose of ending his life.

---

the court considers it for purposes of summary judgment, without ruling on the issue of its ultimate admissibility.

4

## III. Conclusions of Law and Analysis.

The court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) and is thus required to apply Vermont law to the substantive issues. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *In re Coudert Bros. LLP*, 673 F.3d 180, 186 (2d Cir. 2012).

### A. Standard of Review.

Summary judgment must be granted when the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations marks omitted). In deciding the motion, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party and deny the motion if a rational juror could decide in favor of the nonmoving party under the applicable law. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "There is no material fact issue only when reasonable minds cannot differ as to the import of the evidence before the court." *Commander Oil Corp. v. Advance Food Serv. Equip.*, 991 F.2d 49, 51 (2d Cir. 1993).

To avoid summary judgment, the nonmoving party must offer more than "mere speculation and conjecture[,]" *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001), as the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

### B. Whether the Policy's Intentional Acts Exclusion Applies.

Because the Policy excludes coverage "arising out of any act an 'insured' commits or conspires to commit with the intent to cause a loss" (Doc. 27 at ¶ 5), coverage is not available if Mr. Davenport started the fire with the requisite intent. The parties agree that the question of whether Mr. Davenport subjectively intended to burn down his residence is not before the court, as there is no dispute that Mr. Davenport's actions were deliberate and not accidental. The question is rather, whether Mr. Davenport was "civilly insane" when he started the fire, thereby rendering him incapable of an intentional act under Vermont law.

An insurer has the burden of proving that the intentional loss exclusion applies to bar an insured's recovery. *See Nationwide Mut. Fire Ins. Co. v. Petty*, 923 F. Supp. 63, 65 (D. Vt. 1996) (applying Vermont law, the court explained that "[a]s a general rule, the insurer has the burden of proving that an exclusionary clause applies to bar coverage."); *Vill. of Morrisville Water & Light Dep't v. U.S. Fid. & Guar. Co.*, 775 F. Supp. 718, 725 (D. Vt. 1991) ("Insurers, seeking to avoid their duty to defend, must show that a third party's claim against the insured is entirely excluded from coverage.") (citing *City of Burlington v. Glens Falls Ins. Co.*, 340 A.2d 89, 90 (Vt. 1975)). An exclusionary clause must be strictly construed against the insurer as its drafter. *Petty*, 923 F. Supp. at 66.

#### 1. Vermont's Definition of "Civil Insanity."

The Vermont Supreme Court has held "that as a matter of law an insane person is to be considered incapable of forming an intent to cause injury." *Coop. Fire Ins. Ass'n v. Combs*, 648 A.2d 857, 860 (Vt. 1994).[3] Because the parties stipulated that the insured was insane in *Combs*, the court's discussion of civil insanity did not control the case's outcome. *Id.* at 857. This court must therefore predict how the Vermont Supreme Court

---

[3] Prior to *Combs*, the Vermont Supreme Court had concluded when an insured was insane when he or she committed suicide, a life insurance policy provision excluding coverage for suicide does not apply. *See Hathaway's Adm'r v. Nat'l Life Ins. Co.*, 48 Vt. 335, 335 (1875) ("Insanity short of delirium or frenzy whereby all power of self-will and control is lost, will excuse the act of suicide, and prevent the avoidance of a life insurance policy containing a proviso that it shall become void if the assured commits suicide.").

6

would affirmatively decide that issue, were it asked to define "civil insanity" for purposes of the intentional loss exclusion. *See Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994) ("Where the substantive law of the forum state is uncertain or ambiguous, the job of the federal courts is carefully to predict how the highest court of the forum state would resolve the uncertainty or ambiguity."). *Combs* provides guidance in this endeavor.

*Combs* considered two lines of authority addressing whether an insane person can act intentionally for purposes of an intentional loss exclusion. The *Combs* court *rejected* the proposition that, "so long as there is evidence that the insured understood the physical nature and consequences of his action, he is capable of intent even though he may not be capable of distinguishing between right and wrong or of controlling his conduct." *Combs*, 648 A.2d at 858 (citing *Rajspic v. Nationwide Mut. Ins. Co.*, 662 P.2d 534, 536 (Idaho 1983); *Shelter Mut. Ins. Co. v. Williams*, 804 P.2d 1374, 1382 (Kan. 1991); *Colonial Life & Accident Ins. Co. v. Wagner*, 380 S.W.2d 224, 226 (Ky. 1964); *Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 436 (Mich. 1992); *Mallin v. Farmers Ins. Exch.*, 839 P.2d 105, 108 (Nev. 1992); *Johnson v. Ins. Co. of N. Am.*, 350 S.E.2d 616, 620 (Va. 1986)). Instead, the *Combs* court endorsed the more liberal view that "intent can be imputed to rational persons only[.]" *Id.* It explained that the purpose of the exclusionary provisions was "to deny financial benefit to those who intentionally cause injury[,]" and this justification "does not exist where a person is unable to conform his behavior to normal standards[.]" *Id.* It cited with approval the seminal case of *Ruvolo v. Am. Cas. Co.*, 189 A.2d 204 (N.J. 1963),[4] wherein the New Jersey Supreme Court held that:

---

[4] *Ruvolo* "quickly became the leading case concerning the effect of insanity on the operation of intentional act exclusionary clauses in insurance policies." Catherine A. Salton, *Mental Incapacity and Liability Insurance Exclusionary Clauses: The Effect of Insanity Upon Intent*, 78 Calif. L. Rev. 1027, 1045-51 (1990) (noting that the test adopted in *Ruvolo* for determining when a person is "civilly insane" was relied on by many other courts, including, *Globe Am. Cas. Co. v. Lyons*, 641 P.2d 251 (Ariz. Ct. App. 1981); *Rosa v. Liberty Mut. Ins. Co.* 243 F. Supp. 407 (D. Conn. 1965); *Congregation of Rodef Sholom v. Am. Motorists Ins. Co.*, 154 Cal. Rptr. 348 (Cal. Ct. App. 1979), *overruled on other grounds by J.C. Penney Cas. Ins. Co. v. M.K.*, 52 Cal.

> if the insured was suffering from a derangement of his intellect which deprived him of the capacity to govern his conduct in accordance with reason, and while in that condition act[ed] on an irrational impulse . . . his act cannot be treated as "intentional" within the connotation of defendant's insurance contract.

*Id.* at 209; *see also Globe Am. Cas. Co. v. Lyons*, 641 P.2d 251, 257 (Ariz. Ct. App. 1981) (concluding that insured "was unable to act in accordance with reason[,]" in deciding that the intentional act exclusion did not preclude coverage); *Congregation of Rodef Sholom v. Am. Motorists Ins. Co.*, 154 Cal. Rptr. 348, 352 (Cal. Ct. App. 1979) (if the insured "was suffering from a mental disease or defect . . . which deprived him of the capacity to govern his conduct in accordance with reason, then he did not act intentionally as that word is used in the exclusionary clause[.]"), *overruled on other grounds by J.C. Penney Cas. Ins. Co. v. M.K.*, 52 Cal. 3d 1009 (Cal. 1991). The *Combs* court further endorsed the *Ruvolo* standard for "civil insanity" when it explained in dicta that "[a]n insane person whose will is impaired cannot control his conduct even when he understands the consequences of his acts, and one who is emotionally disordered cannot feel emotions which might, in an ordinary person, provide a check to harmful conduct." *Combs*, 648 A.2d at 859.[5]

---

3d 1009 (Cal. 1991); and *Nationwide Mut. Fire Ins. Co. v. Turner*, 503 N.E.2d 212 (Ohio Ct. App. 1986)).

[5] Maintaining that the *Combs* court's discussion of civil insanity is mere dicta, Hartford urges the court to follow *State Farm Fire & Cas. Co. v. Wicka*, 474 N.W.2d 324 (Minn. 1991), pointing out that *Wicka* was cited in *Combs*. *See Combs*, 648 A.2d at 860 (citing *Wicka*, 474 N.W.2d at 327 n.4 for the proposition that "leading insurance law treatises lean toward [the] *Ruvolo* view[.]"). *Wicka*, however, rejects the "liberal view" followed in *Combs, Ruvolo, Congregation of Rodef Sholom*, and *Globe* that, "as a matter of law, . . . the intentional act exclusion does not apply if the injury results from an insane act," *Wicka*, 474 N.W.2d at 327. It also rejects what it characterized as "the narrow view [that] maintains that an insane person may 'intend' an act even though the person cannot appreciate the wrongfulness of that conduct." *Id.* at 328 (collecting cases). It explains that "[w]hile instructive, neither of these opposing views adequately describes when or why an insured's mental illness affects the exclusionary clause. Using words of uncertain meaning and effect, the more liberal view is ill-defined and sweeps too broadly." *Id.* "Conversely, authority representing the narrow view is underinclusive and far too limited." *Id.* The *Wicka* court's own standard would, like Vermont, ultimately render the intentional act exclusion inapplicable where, by reason of a mental illness or defect, an insured could not

8

Thereafter, in *Cooperative Fire Ins. Ass'n of Vermont v. Bizon*, 693 A.2d 722 (Vt. 1997), again in dicta, the Vermont Supreme Court described its decision in *Combs* as follows:

> *Combs* held that as a matter of law an insane person is not capable of forming an intent to cause harm, so an intentional act exclusion cannot apply to the act of an insane person. We did not hold that the intent required to exclude coverage must be wrongful. Nor did we hold that subjective intent to injure, or to injure in a particular way, was required to invoke the exclusion. Instead we noted that mental illness may impair a person's will and emotions so that he cannot control his actions even though he understands their consequences and is therefore deprived of the normal check against harmful conduct. Thus, we viewed 'intent' as a more complex concept than that sought by the insurance carrier and as not including harmful acts committed while insane.

*Bizon*, 693 A.2d at 728 (internal citations omitted). The *Bizon* court further observed that, "in the absence of some evidence of impaired mental capacity or functioning, *Combs* is not relevant[.]" *Id.* at 728-29.

In light of the *Combs* court's reliance on *Ruvolo*, *Globe*, and *Congregation of Rodef Sholom*, and its observations in *Bizon*, this court predicts that the Vermont Supreme Court would adopt a standard for "civil insanity," for purposes of the intentional acts exclusion, that holds that an insured is incapable of engaging in an intentional act if, by reason of a mental illness or defect, the insured's will or emotions are so impaired that the insured cannot control his or her actions even though he or she understands their consequences.

### 2. Whether Civil Insanity May be Decided as a Matter of Law.

Whether a person is capable of acting with a particular mental state is typically a question of fact for the jury. *See N. Sec. Ins. Co. v. Perron*, 777 A.2d 151, 161 (Vt. 2001) (deciding whether a minor intended to sexually abuse another minor, the court "require[s] that the minor perpetrator's intent be determined on a case-by-case basis. Coverage will

---

control his or her conduct "regardless of any understanding of the nature of the act or its wrongfulness." *Id.* at 331.

9

be required only when a trier of fact determines, based on the particular characteristics and experience of the minor, that the minor did not intend to injure by his actions."). Here, Hartford contends that, even viewing all of the facts in the light most favorable to Mr. Davenport, summary judgment remains appropriate because no rational juror could find Mr. Davenport "civilly insane" as he could clearly control his own actions.

Hartford first points out that Mr. Davenport relies solely on the expert evaluation by Dr. Cotton purporting to find Mr. Davenport criminal insane at the time of the fire.[6] It argues that, as a matter of law, an expert opinion on criminal insanity is incapable of supporting a conclusion that Mr. Davenport was civilly insane. In response, Mr. Davenport contends that Dr. Cotton's expert opinion is only one piece of relevant evidence and that his long-standing mental illness and his behavior at the time of the fire must also be considered to determine his intent.

The Vermont Supreme Court has not directly addressed the admissibility, relevance, or weight of a finding of criminal insanity in evaluating "civil insanity."[7] It

---

[6] The Vermont Superior Court which presided over Mr. Davenport's criminal case did not appear to wholly adopt Dr. Cotton's opinion regarding Mr. Davenport's criminal insanity as it dismissed the case against Mr. Davenport without prejudice, allowing the State to reinstate the arson charge if Mr. Davenport was noncompliant with his discharge conditions. If Mr. Davenport was conclusively deemed insane at the time of the fire, there would be little rationale in dismissing without prejudice and on a conditional basis.

[7] In *Combs*, the court rejected the invitation to "formulate a test for applying the exclusionary clause that is even stricter than the test for insanity in a criminal case[.]" *Combs*, 648 A.2d at 859. The courts are sharply divided as to what import, if any, a finding of criminal insanity should have in a parallel civil case. *Compare Ruvolo*, 189 A.2d at 208 ("[If] an insured is of such character as to excuse him from criminal responsibility because of insanity . . . the [action] should not be considered 'intentional' within the meaning of the [insured's] policy.") *and Congregation of Rodef Sholom*, 154 Cal. Rptr. at 352 ("[T]he concept of insanity relevant to the exclusionary clause at issue here should have been more expansive than the concept of insanity accepted at the time of the trial as a defense against a criminal charge.") *with Auto-Owners Ins. Co. v. Churchman*, 489 N.W.2d 431, 435 (Mich. 1992) ("[W]e do not believe that it is appropriate or necessary to find that someone found not criminally liable by reason of insanity cannot be found to have intended his actions and to have expected their consequences.") *and Econ. Preferred Ins. Co. v. Mass*, 497 N.W.2d 6, 9 (Neb. 1993) ("[A]n insane or mentally ill insured may be unable to form the criminal intent necessary to be guilty of a crime, [but] such an individual can still intend or expect the results of injuries he or she causes.").

has explained, that "[c]riminal and civil liability are not synonymous. A criminal conviction does not necessarily establish the existence of civil liability." *State v. Jarvis*, 509 A.2d 1005, 1007 (Vt. 1986). The converse is also true. As one court has explained: "an acquittal in a trial for the criminal offense does not bar the institution of a civil action, nor even constitute evidence of innocence in the civil action, upon the rationale that proof must be established beyond a reasonable doubt in the criminal case, while in civil cases, a preponderance of the evidence will suffice." *Smith v. Pa. Dep't of Transp., Bureau of Driver Licensing*, 747 A.2d 1247, 1250 (Pa. Commw. Ct. 2000).

While criminal and civil liability are not synonymous, the Vermont Supreme Court has considered the intent required for a criminal act in evaluating civil intent. *See Perron*, 777 A.2d at 160 ("[I]f minors cannot appreciate the nature and consequences of . . . sexual activity for purposes of Vermont criminal law, it would be inconsistent to hold that, for purposes of Vermont civil law, when minors engage in sexual acts, *as a matter of law*, they intend the consequences of their acts."). Against this backdrop, the court predicts the Vermont Supreme Court would find Dr. Cotton's opinion admissible, but not dispositive, on the issue of civil insanity. It thus cannot be said to unilaterally control the outcome in this case.[8]

If Dr. Cotton's opinion is not dispositive, and if the absence of an expert on civil insanity may be excused,[9] Hartford asserts that the remaining undisputed facts regarding Mr. Davenport's cognitive and volitional capacity demonstrate that he acted with full control over his actions and was aware of their consequences. For example, Mr.

---

[8] The court notes that there is room for disagreement with several of Dr. Cotton's conclusions, including that Mr. Davenport "could not choose a lawful method to reach his goal" (Doc. 28-4 at 28) short of burning down his house. In addition, Dr. Cotton's findings are somewhat at odds with the findings of Northwestern and VSH, immediately following the fire, that support a conclusion that Mr. Davenport's behavior and attention were unremarkable and his perception was not impaired.

[9] As Hartford points out, Mr. Davenport has failed to designate an expert on civil insanity and has designated Dr. Cotton as his sole expert regarding his state of mind at the time of the fire. The court cannot find fault in Mr. Davenport's failure to do so as the standard for civil insanity has not previously been defined under Vermont law.

11

Davenport considered suicide for weeks and contemplated several alternatives before setting his house on fire -- one of the few methods of attempted suicide that would relieve him of his burgeoning debt. Hartford contends that his actions were therefore not irrational but were directed at a particular objective for which he prepared by removing his belongings and his pets out of harm's way. The Vermont Supreme Court, however, has long observed that the ability to plan is not inconsistent with insanity. *See Hathaway's Adm'r v. Nat'l Life Ins. Co.*, 48 Vt. 335 (1875) ("Insane persons may form plans and execute them, and manifest great shrewdness and mental activity[.] . . . It does not follow, because we can see that an insane man knows that if he blows his brains out it will kill him, and that he does that act for that purpose, that therefore the act was that of a sane mind, voluntarily and deliberately done."). Accordingly, while evidence that Mr. Davenport's decision to set the fire was the product of planning not impulse may be relevant, it by no means controls the outcome of this case.

Hartford's arguments regarding Mr. Davenport's suicide attempts encounter a similar obstacle. Hartford points to *Lenoci v. Leonard*, 2011 VT 47, 189 Vt. 641, 21 A.3d 694, for the proposition that suicide is a voluntary and intentional act absent contrary evidence and supports a conclusion that Mr. Davenport acted intentionally as a matter of law. *Lenoci*, however, does not reach that far. It merely holds that suicide typically interrupts the causal chain of negligence because "[g]enerally speaking, voluntary suicide is viewed as an independent intervening act that breaks the causal chain and severs potential liability." *Id.* at ¶ 17, 189 Vt. at 644, 21 A.3d at 699. "This is because the act of suicide is considered to be a deliberate, intentional, and intervening act[.]" *Id.* at 700. The *Lenoci* court nonetheless acknowledged that this proposition does not hold true if the person is insane. *Id.* ("However, when an injured person becomes insane, even temporarily, and that insanity prevents one from realizing the nature of one's act or controlling one's conduct, a resulting suicide is regarded either as a direct consequence of the injury and not an intervening force or as a normal consequence of the injury inflicted."). Accordingly, under *Lenoci* civil insanity and suicide are by no means mutually exclusive.

12

Finally, even were the court to find Hartford's arguments persuasive, it could not decide this case as a matter of law because rational jurors could differ significantly as to the import of the undisputed evidence. The Vermont Supreme Court has held that when the issue is insanity for purposes of an insurance policy's exclusion, the insured's state of mind is a question for the jury and "[t]he opinion of persons not experts, based upon facts within their own knowledge, and testified to by them, is admissible to prove insanity." *Hathaway's Adm'r*, 48 Vt. at 335. Resolution of this case requires weighing of Dr. Cotton's and Mr. Davenport's credibility, determination of the relevance, reliability and weight of the evaluations performed by Northwestern and VSH, and evaluating the testimony, if any, of persons with knowledge and information regarding the facts and circumstances preceding and during the fire. These are tasks for the finder of fact and cannot be decided by the court on summary judgment. *See Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 1997) ("Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.").

## CONCLUSION

For the reasons set forth above, Hartford's motion for summary judgment (Doc. 28) is DENIED.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this 1st day of November, 2012.

Christina Reiss, Chief Judge
United States District Court